UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DAYNA CASEY, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 21-cv-40133-ADB |
| UNITED PARCEL SERVICE, INC., | * | |
| STEPHANIE KEIMIG, and BRIAN | * | |
| TAYLOR, | * | |
| | * | |
| Defendants. | * | |
| | * | |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS OR STRIKE**

BURROUGHS, D.J.

Plaintiff Dayna Casey ("Plaintiff") brings a 12-count complaint against the United Postal Service ("UPS"), Stephanie Keimig ("Keimig"), and Brian Taylor ("Taylor") (collectively, "Defendants"), alleging that Defendants discriminated against her and failed to provide reasonable accommodation based on a pregnancy-related condition.[1]  [ECF No. 16 ("Am. Compl.")].  Currently pending before the Court is Defendants' motion to dismiss or strike eight counts of the complaint.  [ECF No. 22].  For the reasons stated herein, the motion, [ECF No. 22], is GRANTED.

I. **BACKGROUND**

   A. **Factual Background**

The following facts are drawn from Plaintiff's complaint and viewed in the light most

---

[1] Counts IX and X are brought against only Keimig and Taylor, while the remaining counts are asserted against all Defendants.

1

favorable to Plaintiff.  Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014) (citation omitted).

Plaintiff is employed as a Hub Specialist at the UPS facility located in Shrewsbury, Massachusetts.  [Am. Compl. ¶ 8].  Keimig is Plaintiff's Supervisor as well as a Training Manager, [id. ¶ 10], and Taylor is employed as a Security Supervisor at the Shrewsbury facility, [id. ¶ 9].

Plaintiff is the mother of two young children, both of whom she breastfed.  [Am. Compl. ¶¶ 7, 11].  When she was breastfeeding her children, Plaintiff "needed to pump breastmilk approximately twice during her shifts at UPS."  [Id. ¶ 12].  Accordingly, Plaintiff was granted permission to use the storage closet at the UPS facility to pump, which was represented to be a private space.  [Id. ¶¶ 13–14].

On March 17, 2021, Plaintiff discovered that there was a clandestine camera in the storage closet.  [Am. Compl. ¶ 15].  She wanted to call the police right away, but Taylor, the Security Supervisor, stated that he "wanted to conduct an on-site 'investigation' first."  [Id. ¶ 16].  Although Plaintiff was not comfortable with this decision, she does not claim that she expressed her discomfort to Taylor or Keimig.  [Id. ¶ 20].  As part of the ensuing investigation, Keimig and Taylor "place[d] additional cameras in the closet to try to catch the perpetrator[,]" with two of the three of these cameras facing Plaintiff's back and the third facing her front.  [Id. ¶ 19, 21].  To protect her privacy, Plaintiff was "told to block the front-facing camera and continue pumping as normal."  [Id. ¶ 21].  The installation of the additional cameras, however, only amplified Plaintiff's discomfort, and she did not use the storage closet to pump for the remainder of the day on March 17, 2021.  [Id. ¶ 23].  The following day, Plaintiff again tried to pump in the storage closet, but found that she was "unable to complete her usual pumping session knowing

2

that there would be four cameras in the storage closet[,]" and because she was not confident that blocking the front-facing camera would sufficiently maintain her privacy. [Id. ¶ 24].

Two days after the cameras were placed in the closet, Plaintiff told Keimig, in the presence of other managers, that she wanted to call the police. [Id. ¶ 28]. Keimig responded by "t[aking] Plaintiff out into a break area and reprimand[ing] her for having other managers present for the discussion." [Id. ¶ 29]. Plaintiff apologized and began to cry. [Id. ¶ 30]. Although Keimig "agreed, reluctantly," to call the police, Taylor intervened and "asked Plaintiff to wait to call the Shrewsbury Police until he had made contact with them himself." [Id. ¶¶ 29, 31]. Plaintiff acquiesced, but only "out of fear of the consequences to her job if she did not." [Id. ¶ 32]. Keimig subsequently told Plaintiff that "Taylor had been in touch with the Shrewsbury Police" and that the police "were inclined to let Taylor handle the investigation himself." [Id. ¶¶ 35–36].

Keimig also spoke to Human Resources about the situation, without Plaintiff present, and afterwards told Plaintiff that she intended to remove the camera Plaintiff had discovered. [Am. Compl. ¶¶ 37–38]. Plaintiff objected—presumably because removal of the camera would make identifying the culprit more difficult—and Keimig ultimately left the camera in place. [Id. ¶ 39].

Plaintiff then called the Shrewsbury Police who said that they "had not received a prior complaint from UPS[.]" [Am. Compl. ¶ 40]. The police interviewed Plaintiff over the phone and visited the facility a few days later, on March 23, 2021. [Id. ¶¶ 40–41]. Before the police conducted their on-site investigation, however, Plaintiff witnessed Keimig exit the storage closet carrying "a spray bottle and crumpled towel" and then saw her remove all the cameras from the

3

closet.[2]  [Id. ¶¶ 41–42].  Plaintiff "asked [her] what she was doing and why" but Keimig responded only by telling Plaintiff "to go home."  [Id. ¶ 43].  On March 24, 2021, the police told Plaintiff that "given the number of people who had handled the cameras, it would be difficult to discover the perpetrator."  [Id. ¶¶ 44–45].

On March 25, 2021, "Human Resources contacted Plaintiff to begin an internal investigation."  [Am. Compl. ¶ 46].  Plaintiff told "Human Resources that she had stopped pumping milk at work after her previous accommodations had failed."[3]  [Id. ¶ 47].  Plaintiff sent UPS "a request for leave as a result of these circumstances[,]" [id. ¶ 51], but "UPS failed to respond[,]" [id. ¶ 52].[4]

### B.      Procedural Background

Plaintiff filed her original complaint against Defendants in Massachusetts Superior Court on November 11, 2021.  [ECF No. 1-1].  Defendants removed the case to this Court on December 23, 2021, [ECF No. 1 at 1–4], and on January 21, 2022, Plaintiff filed the operative amended complaint.  [Am. Compl.].  Thereafter Defendants moved to dismiss or strike Counts I, II, III, IV, VII, VIII, IX, and X (which would leave Counts V, VI, XI and XII), [ECF No. 22],

---

[2] Plaintiff later learned that "Keimig removed important evidence from the cameras by wiping them with cleaning fluid."  [Am. Compl. ¶ 42].

[3] Human Resources did "ask if [she] needed accommodations to pump milk at work[,]" but Plaintiff claims that by that point "[her] milk supply was substantially reduced" and "[p]umping milk at work would have been fruitless and traumatic."  [Am. Compl. ¶¶ 48–49].

[4] In her opposition to Defendants' motion, Plaintiff claims belatedly that Defendants denied her request for administrative leave, [ECF No. 24 at 16–17], but when ruling on a motion to dismiss, the Court is constrained by the facts alleged in the operative complaint.  Boston Cab Dispatch, Inc. v. Uber Techs., Inc., No. 13–10769, 2014 WL 1338144, at *15 (D. Mass. Feb. 28, 2014) (quoting Fonte v. Bd. of Managers of Cont'l Towers Condo., 848 F.2d 24, 25 (2d Cir. 1988)) (stating that factual allegations contained in legal briefs or memoranda are "outside the scope of the record when evaluating a 12(b)(6) motion").

Plaintiffs opposed, [ECF No. 24], and the parties then, respectively, filed a reply, [ECF No. 27 (Defendants' Reply)], and a surreply, [ECF No. 30 (Plaintiff's Surreply)].

## II.     LEGAL STANDARD

### A.     Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze those facts in the light most favorable to the plaintiff, and draw all reasonable factual inferences in favor of the plaintiff.  See Gilbert v. City of Chicopee, 915 F.3d 74, 80 (1st Cir. 2019).  "[D]etailed factual allegations" are not required, but the complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and must contain "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).  The alleged facts must be sufficient to "state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

"To cross the plausibility threshold a claim does not need to be probable, but it must give rise to more than a mere possibility of liability." Grajales v. P.R. Ports Auth., 682 F.3d 40, 44–45 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).  "A determination of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. at 44 (quoting Iqbal, 556 U.S. at 679).  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 103 (1st Cir. 2013) (quoting Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).  "The plausibility standard invites a two-step pavane." A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 80 (1st Cir. 2013)

(citing Grajales, 682 F.3d at 45).  First, the Court "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Id. (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)).  Second, the Court "must determine whether the remaining factual content allows a 'reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Morales-Cruz, 676 F.3d at 224).

When reviewing a motion to dismiss, the Court may consider documents outside of the pleadings, "'the authenticity of which are not disputed by the parties,' making narrow exceptions to the general rule 'for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'"  Álvarez-Maurás v. Banco Popular of P.R., 919 F.3d 617, 622–23 (1st Cir. 2019) (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

**B.     Rule 12(f)**

Federal Rule of Civil Procedure 12(f) allows a party to move to strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  The Court has broad discretion to strike comments which are not "substantive elements of the cause of action."  Alvarado–Morales v. Digit. Equip. Corp., 843 F.2d 613, 618 (1st Cir. 1988).  Such motions are, however, "narrow in scope, disfavored in practice, and not calculated readily to invoke the court's discretion."  Boreri v. Fiat S.p.A., 763 F.2d 17, 23 (1st Cir. 1985).  Rule 12(f) motions are not typically granted without a showing of prejudice to the moving party.  See 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 at 421–22 (3d ed. 2016); see also Sheffield v. City of Boston, 319 F.R.D. 52, 54 (D. Mass. 2016).

III.     DISCUSSION

Defendants assert that the eight claims they are challenging are "clearly inapplicable" and reflect "a quintessential 'everything but the kitchen sink' lawsuit[.]" [ECF No. 23 at 1]. Plaintiff contends that she "has pled her claims sufficiently[.]" [ECF No. 24].

A.     **Count I: Violation of Civil Rights, Massachusetts General Laws ch. 12, § 11I**

The Massachusetts Civil Rights Act ("MCRA") is intended to protect all residents and visitors to Massachusetts against threats and interference with their civil rights. Mass. Gen. Laws ch. 12, §§ 11H–11J. To successfully state a claim under the MCRA, a plaintiff must show that (1) the defendant interfered with a right secured by the Constitution or laws of the United States or the Commonwealth and (2) that they did so by "threats, intimidation or coercion." Folmsbee v. Tech Tool Grinding & Supply, Inc., 630 N.E.2d 586, 589 (Mass. 1994); Mass. Gen. Laws ch. 12, §§ 11H, 11I.

Plaintiff claims that "Defendants' actions constitute a violation of Plaintiff's civil rights[,]" [Am. Compl. ¶ 57], but the amended complaint does not specify what civil rights Defendants supposedly interfered with. In subsequent responsive briefing, Plaintiff clarified that her "substantive due process rights were abridged when her privacy was breached at her place of employment" and that her "procedural due process rights were violated when she attempted to remediate the breach by contacting the police and her supervisor and the security guard coerced her not to do so." [ECF No. 24 at 9–11].

Assuming these due process claims were sufficiently pled in the amended complaint—a dubious proposition—due process protections do not extend to private employment or at-will employees like Plaintiff. See Gomez v. Rivera Rodriguez, 344 F.3d 103, 110–11 (1st Cir. 2003); see also Raffucci Alvarado v. Sonia Zayas, 816 F.2d 818, 820 (1st Cir. 1987); Laureano-Agosto

7

v. Garcia-Caraballo, 731 F.2d 101, 103 (1st Cir. 1984); Chandler v. W.E. Welch & Assocs., Inc., 533 F. Supp. 2d 94, 103 (D.D.C. 2008) (stating that the due process clause protects individuals from deprivations of due process by *state actors* and does not extend to the conduct of private employers). For that reason, Plaintiff cannot claim constitutional due process protections as an at-will, private employee.

With the due process claims stripped away, Count I brings a claim for breach of privacy. To make out such a claim under the MCRA, a plaintiff must allege that Defendants interfered with a protected right by engaging in "threats, intimidation or coercion." Mass. Gen. Laws ch. 12, §§ 11H, 11I. Plaintiff, however, has not alleged facts that permit an inference that Defendants' actions rose to the level of threats, intimidation, or coercion. Although she has since claimed in a responsive pleading that she was coerced when she was "told to [pump in the storage closet] in aid of finding the perpetrator or her job was at risk[,]" [ECF No. 24 at 8], no such claim appears in the amended complaint. The amended complaint states only that after Plaintiff discovered the camera on March 17, 2021, she (1) "was not comfortable" with Taylor and Keimig's plan to catch the perpetrator, [Am. Compl. ¶ 20]; (2) "did not pump on March 17, 2021[,]" [id. ¶ 23]; (3) "was unable to complete her usual pumping session" on March 18, 2021 because she worried that her privacy would not be sufficiently maintained, [id. ¶ 24]; and (4) that Plaintiff "has not pumped milk at work since March 18, 2021[,]" [id. ¶ 25]. She does not allege in the amended complaint that her job was threatened if she did not pump in the storage closet. At most, the alleged facts suggest that Plaintiff was uncomfortable with Taylor and Keimig's plan to catch the person responsible for placing the camera in the storage closet, and therefore stopped pumping in that room.

Moreover, even if the Court could infer from the facts alleged that Plaintiff's job was threatened, the "threatened termination of at-will employees [however] is not coercive in the relevant sense under the MCRA." See Nolan v. CN8, 656 F.3d 71, 77 (1st Cir. 2011); see also Webster v. Motorola, Inc., 637 N.E.2d 203, 206 (Mass. 1994). Given that economic pressure on an at-will employee has not been deemed to be coercive under the MCRA and that no other allegations in the amended complaint demonstrate "threats, intimidation or coercion," Count I fails to state a claim and is therefore DISMISSED.

### B.      Count II: Intentional Infliction of Emotional Distress

Defendants argue that Count II, which alleges the intentional infliction of emotional distress ("IIED"), is barred by the exclusivity provision of the Massachusetts Workers' Compensation Act ("WCA"), [ECF No. 23 at 7], which generally precludes employees from pursuing common law claims, such as personal injury claims, against their employer. Mass. Gen. Laws ch. 152, § 24. The test to determine whether a common law action against an employer is barred by the WCA consists of three parts: (1) the plaintiff must be "shown to be an employee;" (2) the plaintiff's condition must be "shown to be a personal injury within the meaning of the [WCA];" and (3) the injury must be "shown to have arisen out of and in the course of [the plaintiff's] employment." Brown v. Nutter, McClennen & Fish, 696 N.E.2d 953, 955 (Mass. App. Ct. 1998).

Here, it is undisputed that Plaintiff is an employee of UPS and that her claims arose out of and in the course of Plaintiff's employment at UPS. See Doe v. Purity Supreme, Inc., 664 N.E.2d 815, 819 (Mass. 1996) (holding that "an injury arises out of the [plaintiff's] employment if it arises out of the nature, conditions, obligations, or incidents of the employment; in other words, out of the employment looked at in any of its aspects" (quoting Caswell's Case, 26

9

N.E.2d 328, 330 (1940)); [ECF No. 23 at 7]. Further, it has been established by existing case law that IIED claims fall within the exclusivity provision of the WCA. Purity Supreme, 664 N.E.2d at 818 (barring an IIED claim under WCA exclusivity provision). Thus the exclusivity provision of the WCA applies to Plaintiff's IIED claim against UPS as an employer.

Defendants contend that the exclusivity provision is equally applicable to Plaintiff's claims against Taylor and Keimig as co-employees. [ECF No. 23 at 8]. A common law claim against a co-employee is precluded under the exclusivity provision of the WCA if the co-employee was "acting in the course of [their] employment." Mendes v. Tin Kee Ng, 507 N.E.2d 1048, 1051 (Mass. 1987). The "course of employment" standard is much "broader" than the "scope of employment" test that is traditionally used to determine whether the WCA exclusivity provision applies to employers. Fredette v. Simpson, 797 N.E.2d 899, 903 (Mass. 2003). The "course of employment" test is satisfied "even if [the employee] has more than one purpose for doing an act, as long as one significant purpose is related to the employment." Id. (quoting Mendes, 507 N.E.2d at 1051).

For example, in Anzalone v. Massachusetts Bay Transp. Auth., the SJC found that the plaintiff's claim for IIED against a co-employee was barred by the exclusivity provision of the WCA even though the co-employee intentionally harassed the plaintiff and interfered with his employment because the conduct "related wholly to [the co-employee's] position as [the plaintiff's] supervisor." 526 N.E.2d 246, 249 (Mass. 1988). Courts have also found that a co-employee's alleged offending conduct is "in the course of employment" if the conduct was "committed . . . on [the employer's] premises[,] during working hours, and while acting as [the employee's] supervisor." Bazile, 405 F. Supp. 3d at 184–85 (preempting plaintiff's IIED claim).

There is no dispute that Taylor and Keimig's alleged conduct occurred during working hours and on UPS's premises. [Am. Compl. ¶¶ 9–10, 13–55]. Plaintiff asserts only that her claims against Taylor and Keimig are not preempted because their actions "d[id] not . . . further the interests of [UPS.]" [ECF No. 24 at 15]. For a claim against a co-worker to be precluded under the WCA, however, the conduct need only "relate[] to the employment[,]" Fredette, 797 N.E.2d at 903 (quoting Mendes, 507 N.E.2d at 1051), and Taylor and Keimig's actions did relate to their respective jobs. Taylor managed security at the UPS facility, so his decision to investigate the alleged camera in the storage closet aligned with his underlying responsibilities. [Am. Compl. ¶¶ 9, 16, 19, 21]. Keimig served as Plaintiff's direct supervisor; therefore, her decision to assist Taylor in the investigation and to communicate with Plaintiff about the status of the investigation related to her role at UPS. [Id. ¶¶ 10, 19, 21, 35–36, 38]. Accordingly, because Plaintiff's IIED claims against UPS and her co-employees are preempted by the WCA's exclusivity provision, Count II is DISMISSED.

  **C.**  **Count III: Violation of Massachusetts General Laws ch. 214, § 1B**

Plaintiff claims that Defendants' actions violated Massachusetts General Laws ch. 214, § 1B, which protects an individual's right to be free from "unreasonable, substantial or serious interference with [her] privacy." [Am. Compl. ¶ 63]; Mass. Gen. Laws ch. 214, § 1B. "In order for a plaintiff to succeed on an invasion of privacy claim, [s]he must prove not only that the defendant unreasonably, substantially and seriously interfered with h[er] privacy by disclosing facts of highly personal or intimate nature, but also that it had no legitimate reason for doing so." Martinez v. New England Med. Ctr. Hosps., Inc., 307 F. Supp. 2d 257, 267 (D. Mass. 2004) (citing Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 567 N.E.2d 912, 914 (Mass. 1991)). Disclosure is an "essential element of the cause of action" for an invasion of privacy.

See Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2004); see also Tobin v. Fed. Exp. Corp., 775 F.3d 448, 451 (1st Cir. 2014) (stating that "[d]isclosure (that is, proof that [a defendant] disclosed [private information] to a third party) is an essential element of the plaintiff's privacy claim.").

Plaintiff claims that her privacy was breached (1) when Keimig gave her permission to pump in the storage closet, which was represented to be a private space but contained a camera, and (2) when Taylor and Keimig introduced additional cameras into the storage closet in an attempt to catch the perpetrator. [Am. Compl. ¶¶ 15, 19, 21; ECF No. 24 at 12]. With regard to Plaintiff's first argument—that Defendants violated her privacy by giving her permission to pump in the closet—Plaintiff does not claim that Defendants put the first camera in the closet or that Defendants disclosed any recordings from said camera, assuming such recordings even exist. See generally [Am. Compl.]; [ECF No. 23 at 10]. Absent an allegation of disclosure, Plaintiff's argument necessarily fails. Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 616-17 (D. Mass. 2016) (stating that a complaint must "allege facts giving rise to more than a mere possibility that, even if [private information was disclosed], it was [the defendants] that did so").

Regarding the additional cameras that Taylor and Keimig placed in the storage closet, Defendants reiterate that Plaintiff does not claim that Defendants disclosed any of Plaintiff's private information to a third party. See [ECF No. 23 at 10–11]. Plaintiff responds only that the amended complaint "clearly demonstrates that [Taylor and Keimig] intended" to disclose the footage in order to "catch the perpetrator." [ECF No. 24 at 13]. While it is plausible that Taylor and Keimig intended, at some future time, to disclose the footage to other individuals at UPS as part of their investigation, Plaintiff does not allege that any disclosure actually occurred and, as

12

such, has failed to plead all necessary elements of the claim.[5]  [ECF No. 24 at 13; ECF No. 30 at 4]; see Tobin, 775 F.3d at 451 (in order to bring a claim under Massachusetts General Laws ch. 214, § 1B, "the plaintiff must, *at a bare minimum*, carry the burden of proving that a disclosure *took place*" (emphasis added)).  For these reasons, Count III is DISMISSED.

### D.  Count IV: Invasion of Privacy

In her amended complaint, Plaintiff states that "[i]n the alternative to c[h]. 214 § 1B, Defendants' actions constitute a tortious invasion of Plaintiff's privacy."  [Am. Compl. ¶ 66].  Massachusetts, however, "has never recognized a common-law cause of action for invasion of privacy," Spencer v. Roche, 755 F. Supp. 2d 250, 271 (D. Mass. 2010) (citing Alberts v. Devine, 479 N.E.2d 113, 120–21 (Mass. 1985)), and only "'recognizes an actionable right of privacy' under the privacy statute," Axford v. TGM Andover Park, LLC, No. 19-cv-11540, 2021 WL 681953, at *13 (D. Mass. Feb. 22, 2021) (quoting Dasey, 304 F.3d at 153).  Plaintiff's cause of action for invasion of privacy (Count IV) thus fails as a matter of law and is DISMISSED.

### E.  Counts VII & VIII: Unlawful Retaliation

Plaintiff claims that "Defendants' failure to remediate the discrimination [against her] constitutes an adverse employment action in retaliation for requesting a pregnancy-related accommodation, in violation [of] [Massachusetts General Laws] ch. 151B, § 4(4) [and Title VII]."  [Am. Compl. ¶¶ 74–79].  To bring a retaliation claim under Chapter 151B and Title VII, a plaintiff must plausibly plead that (1) she engaged in protected conduct, (2) she was subject to an

---

[5] In her surreply, Plaintiff reiterates that "[e]ven if [Taylor and Keimig] did not view [the] footage, it was clearly their intention to do so" and that "[d]iscovery will confirm this."  [ECF No. 30 at 4].  The issue, however, is not whether Taylor and Keimig viewed the footage—Plaintiff attempted to pump breastmilk in the storage closet on March 18, 2021 knowing full well that Taylor and Keimig would be reviewing the footage—but whether third parties viewed the footage, which Plaintiff has not alleged.  [Am. Compl. ¶ 24].

adverse employment action, and (3) there was a causal connection between the two. Sepúlveda-Vargas v. Caribbean Rests., LLC, 888 F.3d 549, 555 (1st Cir. 2018); Mole v. Univ. of Mass., 814 N.E.2d 329, 338–39 (Mass. 2004).

In her opposition to Defendants' motion, Plaintiff explains that she (1) engaged in a "protected activity" when she requested an accommodation to pump breastmilk at work, (2) that she was subject to an adverse employment action when she was denied that accommodation, and (3) that there was a direct causal relationship between these events because Defendants' failure to accommodate was a direct result of Plaintiff's expressed need to pump breastmilk at work. [ECF No. 24 at 16–17]. An employer's failure to accommodate, however, "cannot constitute retaliation for an employee's request for accommodation." Gomez v. Laidlaw Transit, Inc., 455 F. Supp. 2d 81, 90 (D. Conn. 2006); see also Incutto v. Newton Pub. Sch., No. 16-12385, 2019 U.S. Dist. LEXIS 58320, *12 (D. Mass. Apr. 4, 2019) (holding that an employee cannot "repackag[e] her failure to accommodate claim into a retaliation claim" premised upon the same facts). Thus, regardless of whether Defendants failed to provide a reasonable accommodation for Plaintiff to pump breastmilk, the facts do not make out a claim for retaliation.[6] Accordingly, Counts VII and VIII are DISMISSED.

---

[6] Plaintiff claims that Defendants further retaliated against her when they demanded that Plaintiff "go back into the closet" and "bare her breast and pump in front of cameras[,]" [ECF No. 24 at 17], and "denied [her] request for administrative leave[,]" [id. at 16–17]. These claims, however, are not supported by the facts alleged in the amended complaint and do not support a claim for retaliation. First, Plaintiff has not alleged that anyone at UPS demanded that she continue pumping in the closet, and contrary to her assertion that Defendants ordered her to expose herself to the cameras, the amended complaint suggests that Defendants sought to protect her privacy by telling her "to block the front-facing camera" when using the closet. [Am. Compl. ¶ 21]. Second, both claims speak only to Defendants possible failure to accommodate Plaintiff—either by not providing her an alternate room in which to pump or not granting her request for administrative leave due to her need to pump—and, as discussed above, an employer's alleged failure to accommodate is insufficient to support a claim for retaliation.

### F. Count IX: Aiding and Abetting in violation of Massachusetts General Laws ch. 151B, § 4(5)

Plaintiff brings Count IX only against Taylor and Keimig. [Am. Compl. at 9]. In order to prevail on a claim of aiding and abetting a violation of Chapter 151B, "a plaintiff must show that the defendant[:] (1) committed a wholly individual and distinct wrong . . . separate and distinct from the claim in main; (2) that the aider or abetter shared an intent to discriminate not unlike that of the alleged principal offender; and (3) that the aider or abetter knew of his or her supporting role in an enterprise designed to deprive [the plaintiff] of a right guaranteed him or her under [statute prohibiting unlawful employment discrimination]." Lopez v. Commonwealth, 978 N.E.2d 67, 82 (Mass. 2012) (omission and third alteration in original) (internal quotation marks omitted).

Defendants argue that since Plaintiff does not allege any "individual and distinct wrong" committed by Keimig or Taylor, Plaintiff's aiding and abetting claim must fail. [ECF No. 23 at 14]. Plaintiff responds by reciting each of the alleged behaviors that Taylor and Keimig engaged in when they purportedly "acted in reckless disregard of [Plaintiff's] rights"—e.g., Taylor and Keimig "failed to accommodate her need for a private space" and "breached her privacy[.]" [ECF No. 24 at 18–19]. Yet, these alleged behaviors are not "separate and distinct" from the main discrimination claims brought against Defendants collectively, as required to plead an aiding and abetting claim. Instead, they are the very same allegations that give rise to Plaintiff's claims against UPS. Thus Plaintiff has failed to state a claim under Massachusetts General Laws ch. 151B, § 4(5) and Count IX is <u>DISMISSED</u>.

### G. Count X: Interference with Rights Protected by Massachusetts General Laws ch. 151B

Count X is also brought only against Taylor and Keimig. [Am. Compl. at 9]. To establish a claim for interference under Massachusetts General Laws ch. 151B, § 4(4A), a

15

plaintiff must show that each defendant "(1) [] had the authority or the duty to act on behalf of the employer; (2) their action or failure to act implicated rights under the statute; and (3) there is evidence articulated by the complainant that the action or failure to act was in deliberate disregard of the complainant's protected rights allowing the inference to be drawn that there was intent to discriminate or interfere with the complainant's exercise of his rights." Furtado v. Standard Parking Corp., 820 F. Supp. 2d 261, 278 (D. Mass. 2011).

Defendants argue that "[t]here is nothing in the [a]mended [c]omplaint to suggest that Keimig or Taylor acted with a specific intent to discriminate" or "took any actions out of discriminatory animus based on [Plaintiff's sex or pregnancy-related condition]." [ECF No. 23 at 15]. Plaintiff asserts, however, that Defendants "interfered with [her] rights" when they "acted to coerce her to return to the closet and pump, and then not act on her right to remedy the discrimination and call the police." [ECF No. 24 at 19]. While the allegations Plaintiff references may speak to whether Defendants failed to accommodate Plaintiff, they do not give rise to a plausible inference that Taylor or Keimig harbored an animus towards Plaintiff because she was a woman or pregnant. Plaintiff has not alleged, for example, that Taylor or Keimig made any statements or comments that suggest a negative view towards women or people who are, or can become, pregnant. Cf. Saari v. Allegro Microsystems, LLC, 436 F.Supp.3d 457, 466–67 (D. Mass. 2020) (holding that plaintiff "alleged facts plausibly establishing that [d]efendants deliberately disregarded her right to be free from discrimination" by making unwelcomed sexual comments toward plaintiff). Without more, the Plaintiff has not plausibly pled that Taylor or Keimig discriminated against her on those bases. Accordingly, Count X is DISMISSED.

## IV. CONCLUSION

Accordingly, because Plaintiff has failed to plead sufficient facts to state plausible claims, the motion to dismiss or strike Counts I, II, III, IV, VII, VIII, IX, and X, [ECF No. 22], is GRANTED.

**SO ORDERED.**

July 20, 2022                                                                 /s/ Allison D. Burroughs
                                                                              ALLISON D. BURROUGHS
                                                                              U.S. DISTRICT JUDGE